UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------X

MOHAMMADREZA DAEISADEGHI,

                                             16 CV 1698 (ADS) (SIL)

                Plaintiff,

           -against-

EQUINOX GREAT NECK, INC.,

                Defendant.

-------------------------------------------------------X

---

# MEMORANDUM OF LAW IN
# SUPPORT OF DEFENDANT'S MOTION
# FOR SUMMARY JUDGMENT

---

*On the brief:*
*Lawrence S. Rosen, Esq.*
*Patrick McPartland, Esq.*
*Jared E. Blumetti, Esq.*

**LAROCCA HORNIK ROSEN
GREENBERG & BLAHA LLP**
40 Wall Street, 32nd Floor
New York, New York 10005
T: (212) 530-4837
E: LROSEN@LHRGB.COM
   PMCPARTLAND@LHRGB.COM
   JBLUMETTI@LHRGB.COM
*Attorneys for Defendant,*
*Equinox Great Neck, Inc.*

## <u>TABLE OF CONTENTS</u>

**PRELIMINARY STATEMENT** …………………………………………………   1

**STATEMENT OF FACTS**……………………………………………………   3

A.   The Parties and Relevant Witnesses…………………………………………   3

B.   Equinox's Policy Provides That Employee Discounts
     For Personal Training Sessions Can Only be Used by Employees……………   5

C.   Plaintiff's Employment is Terminated for Violating the
     Employee Discount Policy…………………………………………………   5

D.   Plaintiff's Post-Termination Complaint to the Ethics Hotline………………   7

E.   Plaintiff's Claims Were Dismissed by the NYSDHR for Lack
     Of Probable Cause…………………………………………………………   7

F.   Plaintiff's Claims in this Lawsuit……………………………………………   7

**ARGUMENT** …………………………………………………………………   9

I.   PLAINTIFF'S EMPLOYMENT WAS LAWFULLY TERMINATED
     FOR VIOLATING THE "EMPLOYEE DISCOUNT"
     POLICY AND LYING……………………………………………………   9

II.  PLAINTIFF WAS NOT SUBJECTED TO A HOSTILE
     WORK ENVIRONMENT……………………………………………………   12

     A.   Plaintiff's Hostile Work Environment Claim Fails
          Under the Rigorous Standards of Title VII………………………………   12

     B.   Plaintiff's Hostile Work Environment Claims is
          Barred by the Faragher-Ellerth Defense…………………………………   17

**CONCLUSION**…..…………………………………………….………………   18

## <u>**TABLE OF AUTHORITIES**</u>

<u>**Cases**</u>

*Alfano v. Costello*,
     294 F.3d 365 (2d Cir. 2002)……………………………………………… 13

*Anderson v. National Grid, PLC*,
     93 F.Supp.3d 120 (E.D.N.Y. March 25, 2015)……………………………. 11

*Benn v. City of New York*,
     2011 WL 839495 (E.D.N.Y. March 4, 2011)…………………………….. 14

*Brown v. The Pension Boards*,
     488 F.Supp.2d 395 (S.D.N.Y. 2007)……………………………………. 11

*Devers v. SNC-Lavalin Generation, Inc.*,
     2014 WL 4954623 (E.D.N.Y. September 30, 2014)………………………. 13

*Dorrilus v. St. Rose's Home*,
     234 F.Supp.2d 326 (S.D.N.Y. 2002)……………………………………. 15

*Gobin v. New York City Health and Hospitals Corp.*,
     2006 WL 2038621 (S.D.N.Y. July 19, 2006)…………………………….. 15

*Heba v. New York State Div. of Parole*,
     537 F.Supp.2d 457 (E.D.N.Y. 2007)……………………………………. 16

*Hyek v. Field Support Services, Inc.*,
     702 F.Supp.2d 84 (E.D.N.Y. 2010)……………………………………… 14

*Jackson v. Nor Loch Manor Healthcare Facility*,
     297 F.Supp.2d 633 (W.D.N.Y. 2004);
     *aff'd* 2005 WL 1403266 (2d Cir. June 15, 2005)………………………… 11

*Joseph v. Owens & Minor Distribution, Inc.*,
     5 F.Supp.3d 295 (E.D.N.Y. 2014)……………………………………… 10

*Kasiotakis v. Macy's Retail Holdings, Inc.*,
     2015 WL 6125356 (S.D.N.Y. October 16, 2015)……………………….. 10, 12

*Maxton v. Underwriter Laboratories, Inc.*,
     4 F.Supp.3d 534 (E.D.N.Y. 2014)……………………………………… 13

*McPherson v. NYP Holdings, Inc.*,
     2005 WL 2129172 (E.D.N.Y. September 1, 2005),
     *aff'd* 2007 WL 1830764 (2d Cir. June 27, 2007)……………………….. 17, 18

*Monclova v. City of New York*,
    2014 WL 4828813 (E.D.N.Y. September 29, 2014)……………………………  13

*Monterroso v. Sullivan & Cromwell, LLP*,
    591 F.Supp.2d 567 (S.D.N.Y. 2008)………………………………………………  15

*Petrisch v. HSBC Bank USA, Inc.*,
    2013 WL 1316712 (E.D.N.Y. March 28, 2013)…………………………………  14

*Richards v. NYC Dept. of Homeless Services*,
    2009 WL 700695 (E.D.N.Y. March 15, 2009)…………………………………  16

*Sandyford v. Fort Greene Senior Citizen's Council, Inc.*,
    2009 WL 705761 (E.D.N.Y. March 16, 2009)………………………………  13, 16

*Sethi v. Narod*,
    12 F.Supp.3d 505 (E.D.N.Y. 2014)………………………………………………  10

*Stembridge v. City of New York*,
    88 F.Supp.2d 276 (S.D.N.Y. 2000)………………………………………………  15

*St. Louis v. New York City Health and Hosp. Corp.*,
    682 F.Supp.2d 216 (E.D.N.Y. 2010)……………………………………………  13

*Stuart v. T-Mobile USA, Inc.*,
    2015 WL 4760184 (S.D.N.Y. August 12, 2015)………………………………  11

*Wesley-Dickson v. Warwick Valley Cent. School Dist.*,
    973 F.Supp.2d 386 (S.D.N.Y. 2013)……………………………………………  15

*Whethers v. Nassau Health Care Corp.*,
    956 F.Supp.2d 364 (E.D.N.Y. 2013)……………………………………………  10

*Wojcik v. Brandiss*,
    973 F.Supp.2d 195 (E.D.N.Y. 2013)……………………………………………  10, 11

Defendant Equinox Great Neck, Inc., by its attorneys LaRocca Hornik Rosen Greenberg & Blaha LLP, respectfully submits this memorandum of law in support of its motion for summary judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure, to dismiss plaintiff's Complaint in its entirety with prejudice.

## **PRELIMINARY STATEMENT**

Plaintiff, who was employed by Equinox Holdings, Inc. ("Equinox") as a manager of the personal training department of Equinox's fitness club located in Great Neck, New York, was terminated from his employment on April 1, 2015 for egregious violations of Equinox's company policy on providing employee discounts. Equinox's written policy provides that employee discounts are permitted to be used by employees only, and that employees utilizing the employee discount to make purchases for family, friends, or Equinox members will be disciplined up to and including termination of employment. Plaintiff violated this policy when he provided his personal lawyer—an Equinox member—with employee discounts on personal training sessions in excess of $10,000, and then lied to Equinox in an attempt to cover up his wrongdoing.

On March 29, 2015, Equinox observed plaintiff's lawyer, Ilene Cohen, using a personal training session that was purchased in plaintiff's name using plaintiff's employee discount. Notably, this occurred just months after Equinox's Vice President of Personal Training issued an email to all personal training managers (including plaintiff) reinforcing Equinox's written policy that the employee discount was intended for use by employees only, and warning that anyone caught purchasing personal training sessions for a member using their employee discount would be subject to immediate termination. Equinox confronted plaintiff with Ms. Cohen's use of the discounted personal training session, and he ***admitted*** that he purchased discounted personal training sessions for her as a *quid pro quo* for a legal referral. Plaintiff then tried to cover up the

scope of his wrongdoing by claiming that he purchased these sessions ***prior to*** receiving the October 22, 2014 email from the Vice President of Personal Training warning plaintiff that it was a violation of Equinox's policy to provide employee discounts to a member.

Following plaintiff's admission, Michael Caporusso, a Regional Director of Personal Training for Equinox, conducted an investigation which revealed that at least 276 discounted personal training sessions were purchased for Ms. Cohen using plaintiff's employee discount over the trailing two years, and that ***more than 70*** of these discounted sessions had been purchased for Ms. Cohen ***after*** plaintiff received the Vice President's email warning precisely against this improper conduct.  Based on these facts, Mr. Caporusso concluded that plaintiff had not only grossly violated company policy, but that he also lied about his conduct in an effort to cover it up. As a result, Mr. Caporusso justifiably made the decision to terminate plaintiff's employment.

Immediately after plaintiff was advised that his employment with Equinox was terminated (i.e. later that same day), plaintiff disingenuously contacted Equinox's Ethics Hotline for the first time and made a discrimination complaint against Joshua Harrison, who not only had initially interviewed and hired plaintiff, but who had also approved the multiple promotions that plaintiff had received subsequent to his hiring.  In his post-termination complaint to the Ethics Hotline, plaintiff made no complaints at all regarding Matthew Bekteshi, against whom plaintiff now asserts harassment allegations.

In any event, plaintiff's allegations against Mr. Harrison and Mr. Bekteshi are woefully insufficient as a matter of law to support a hostile work environment claim under the demanding standards of Title VII (as discussed below).  Further, even if plaintiff had an actionable claim, his claim would be barred under the *Faragher-Ellerth* defense because there is no evidence in the

instant record that plaintiff made a protected complaint of discrimination *prior to* the termination of his employment.

For these reasons (and the reasons set forth below), plaintiff's Complaint must be dismissed in its entirety with prejudice.

## STATEMENT OF FACTS

### A.   The Parties and Relevant Witnesses

Equinox owns and operates more than 90 luxury fitness clubs throughout the United States, Canada, and the United Kingdom, including the Equinox fitness clubs located in Great Neck, New York (the "Great Neck Club") and Roslyn, New York (the "Roslyn Club"). It employed plaintiff and all other Equinox employees referenced in this lawsuit. Defendant Equinox Great Neck, Inc. is a single purpose entity which acts as the lessee of the Great Neck Club. *See the Affidavit of Michael Caporusso, sworn to on July 13, 2018 (the "Caporusso Aff."), ¶ 1.*

Plaintiff was employed by Equinox as an employee at will from January 2011 until the termination of his employment on April 1, 2015. *See the Declaration of Patrick McPartland, dated July 13, 2018 (the "McPartland Decl."), Exh. A, Exh. C, pp. 61, 90–91, 228–229, 348.* From January 2013 until the termination of his employment, plaintiff was employed as the Personal Training Manager at the Great Neck Club. *McPartland Decl., Exh. A, Exh. C, pp. 148, 217, 228–229.* As the Personal Training Manager, plaintiff was responsible for supervising approximately 40 employees in the personal training department, including all of the personal trainers at the club and the Fitness Manager. *McPartland Decl., Exh. C, pp. 148–150.* Prior to that, plaintiff was the Personal Training Manager at the Roslyn Club from December 2011 to December 2012; the Fitness Manager at the Great Neck Club from September 2011 to December 2011; and the Fitness

Manager in Training at the Great Neck Club from January 2011 and September 2011. *McPartland Decl., Exh. C, pp. 88, 112, 134, 148–149.*

Joshua Harrison has been employed by Equinox since 2005. *McPartland Decl., Exh. D, p. 8.* During the time-period of plaintiff's employment, Mr. Harrison was an Area Personal Training Manager, in which role he was responsible for developing the skills of Personal Training Managers and Fitness Managers at various Equinox clubs within his region, including the Great Neck Club and Roslyn Club. *McPartland Decl., Exh. D, pp. 9–11, 16.* Mr. Harrison was responsible for interviewing and hiring plaintiff at Equinox in 2011; approved the multiple promotions that were granted to plaintiff during his employment; and frequently encouraged plaintiff's work performance. *McPartland Decl., Exh. C, pp. 251-252, 259-268, Exh. D, p. 43.*

Michael Caporusso has been employed by Equinox since 2000. *Caporusso Aff., ¶ 1.* He has held the position of Regional Director of Personal Training since January 2014. *Caporusso Aff., ¶ 2.* In this role, he is responsible for the overall performance and operation of the personal training department of each Equinox fitness club located in his region, which, at the time of the termination of plaintiff's employment, included the Great Neck Club. *Id.*

Matthew Bekteshi was employed by Equinox from October 2012 to April 2017. *McPartland Decl., Exh. E, pp. 7–9.* He was the Assistant General Manager of the Great Neck Club until October 2013, at which time he was promoted to General Manager. *Id.*

Ilene Cohen, who is a solo-practitioner attorney, was a member of the Roslyn Club during the time-period of plaintiff's employment. *McPartland Decl., Exh. F, p. 11, 32.* She knew plaintiff for several years through his employment at the Roslyn Club. *McPartland Decl., Exh. F, pp. 13–14.* Between 2013 and 2016, she provided various legal services for plaintiff at his request, including handling numerous traffic tickets for him and assisting him in retaining a family lawyer

4

for a custody dispute he was having with his ex-girlfriend. *McPartland Decl., Exh. F, pp. 11, 15–26.* She testified that plaintiff provided her with discounted personal training sessions in exchange for these legal services. *McPartland Decl., Exh. F, p. 56.*

**B.    Equinox's Policy Provides That Employee Discounts
for Personal Training Sessions Can Only be Used by Employees**

During the time-period of plaintiff's employment, Equinox provided its employees with a forty percent (40%) discount on the purchase of personal training sessions (the "Employee Discount"). *McPartland Decl., Exh. C, pp. 97, 322–323, Exh I, p. 33.* Equinox's written policy stated that the Employee Discount was permitted to be used by employees only, and that employees utilizing the Employee Discount to make purchases for family, friends, or Equinox members will be disciplined up to and including termination of employment. *Id.*

Consistent with this policy, David Harris, Equinox's Vice President of Personal Training, sent an email on October 22, 2014, to all Personal Training Managers (including plaintiff) stating that it had been discovered that certain Personal Training Managers had been improperly purchasing personal training sessions for members using their Employee Discount (the "David Harris Email"). *McPartland Decl., Exh. C, pp. 323–324; Caporusso Aff., ¶ 4, Exh. B.* In his email, Mr. Harris reinforced to the Personal Training Managers that "the 40% discounts for [p]ersonal [t]raining purchases is a privilege granted to us as employees to engage in [p]ersonal [t]raining with our staff" and "[a]nyone caught engaging in this or other unethical activity w[ould] be subject to immediate termination." *Id.*

**C.    Plaintiff's Employment Is Terminated for Violating the Employee Discount Policy**

On March 29, 2015, Joshua Harrison observed that Ilene Cohen was training with a personal trainer at the Roslyn Club using a personal training session purchased in plaintiff's name with plaintiff's Employee Discount. *McPartland Decl., Exh. C, p. 338, Exh. D, pp. 31–34;*

*Caporusso Aff., ¶ 5, Exh. C.*  Mr. Harrison immediately sent an email to plaintiff, who was working at the Great Neck Club at the time, asking why Ms. Cohen was using a personal training session purchased in his name.  *McPartland Decl., Exh. C, p. 338; Caporusso Aff., ¶ 5, Exh. C.*  In response, plaintiff admitted that he "purchase[d] the [personal training] sessions for [Ms. Cohen] as a gift" because she "did a favor for [him]" involving a custody dispute over his son, Naveed.  *Id.*  He further asserted that he purchased the personal training sessions for Ms. Cohen ***prior*** to the David Harris Email.  *Id.*

Mr. Harrison reported the incident to Mr. Caporusso, who directed an investigation into the purchases made for Ms. Cohen using plaintiff's Employee Discount.  *McPartland Decl., Exh. D, pp. 33–34; Caporusso Aff., ¶¶ 5–6.*  The investigation revealed that at least 276 personal training sessions were purchased for Ms. Cohen using plaintiff's Employee Discount over the course of two years resulting in Ms. Cohen receiving more than $10,000 in discounts.  *Caporusso Aff., ¶¶ 6–7, Exh. D.*  It also revealed that at least 72 personal training sessions were purchased for Ms. Cohen at a discount of nearly $3,000 using plaintiff's Employee Discount ***after*** the David Harris Email.  *Id.*  At his deposition, plaintiff admitted the dates of the purchases and that all of these discounted personal training sessions were purchased for Ms. Cohen using his Employee Discount.  *McPartland Decl., Exh. C, pp. 288–290, 294–298, 323–324, 331–332.*

Based on these facts, Mr. Caporusso concluded that plaintiff had grossly violated the Employee Discount policy; that he had disregarded the David Harris Email; and that he had lied in his email to Mr. Harrison by stating that he purchased the sessions for Ms. Cohen prior to his receipt of the David Harris Email.  *Caporusso Aff., ¶ 8.*  As a result, he made the decision to terminate plaintiff's employment.  *Id.*

**D.**   **Plaintiff's Post-Termination Complaint to the Ethics Hotline**

Following the termination of his employment, plaintiff called Equinox's Ethics Hotline—a toll-free hotline allowing any employee to make complaints, 24 hours per day, 7 days per week—and made purported complaints about Joshua Harrison.  *McPartland Decl., Exh. C, pp. 255–256, Exh. H, Exh. I, Exh. J.*  Notably, despite his allegations against Mr. Bekteshi in this lawsuit, he made no complaints against Mr. Bekteshi at all during his call.  *McPartland Decl., Exh. J.*  When questioned at his deposition as to why he made no complaints about Mr. Bekteshi, plaintiff simply responded that he "forgot."  *McPartland Decl., Exh. C, p. 256.*

As plaintiff admits, he was fully aware during his employment—both as an employee and a manager of more than 40 employees—of Equinox's written policies allowing employees to make confidential complaints to Human Resources and the Ethics Hotline.  However, he admits that he never made any such complaints prior to the termination of his employment.  *McPartland Decl., Exh. C, pp. 93–96, 214, Exh. H, Exh. I.*

**E.**   **Plaintiff's Claims Were Dismissed by the NYSDHR for Lack of Probable Cause**

Prior to commencing this lawsuit, plaintiff filed a complaint with the New York State Division of Human Rights ("NYSDHR") alleging unlawful termination and hostile work environment claims based upon his race and national origin.  *McPartland Decl., Exh. K.*  Following a full investigation by the NYSDHR, those claims were ***dismissed for lack of probable cause***.  *McPartland Decl., Exh. L.*

**F.**   **Plaintiff's Claims in this Lawsuit**

Plaintiff commenced this action on April 7, 2016, alleging that his employment was unlawfully terminated and that he was subjected to a hostile work environment under Title VII because of his Persian/Iranian national origin.  *McPartland Decl., Exh. A.*

His hostile work environment claims are directed at Mr. Harrison and Mr. Bekteshi. *McPartland Decl., Exh. C.* At his deposition, he alleged that Mr. Harrison would sometimes "elongate" his name during weekly conference calls that Mr. Harrison conducted with the Personal Training Managers and Fitness Managers at the clubs in his region. *McPartland Decl., Exh. C, pp. 268–272.* He alleges that Mr. Harrison did not begin elongating his name until August 2014 (this, despite plaintiff's admission that he had been participating in the calls since 2011). *Id.* Plaintiff admits that he never said anything to Mr. Harrison about any alleged conduct during the conference calls and never reported any such conduct to Human Resources or the Ethics Hotline. *McPartland Decl., Exh. C, pp. 111, 122, 139, 214, 276.*

For his part, Mr. Harrison testified that he adopted a playful attitude during the weekly calls, which included sometimes announcing the names of different managers on the calls with a flourish. *McPartland Decl., Exh. D, pp. 42–45.* Indeed, Ramon Solano, a former Equinox employee who is originally from the Dominican Republic, testified that Mr. Harrison would sometimes exaggerate the pronunciation of his first and last name on the calls and sometimes attempted to speak to him in Spanish. *McPartland Decl., Exh. G, pp. 50, 87, 100–101.* Mr. Solano further confirmed that Mr. Harrison would "poke fun" at various employees regardless of national origin. *McPartland Decl., Exh. G, p. 101.*

As for Matthew Bekteshi, plaintiff asserts that Mr. Bekteshi made fun of his accent and referred to him as a "crazy Persian maniac" and a "fucking Persian." *McPartland Decl., Exh. C, pp. 172–175, 216.* He admits that he and Mr. Bekteshi had fun and joked around in the workplace. *McPartland Decl., Exh. C, pp. 165, 245–248.* When asked whether he thought Mr. Bekteshi was joking with him, he stated, "I don't know; you can ask [Mr. Bekteshi]." *McPartland Decl., Exh. C, p. 216.* Mr. Bekteshi, who is Albanian, testified that he had joked with plaintiff in a back and

forth banter where plaintiff would call Mr. Bekteshi a "crazy Albanian" and Mr. Bekteshi would call plaintiff a "crazy Persian." *McPartland Decl., Exh. E, pp. 21, 44–45.*

As part of the admitted "joking around" in the workplace, plaintiff, who is a former professional kickboxer, testified that he would routinely tell Mr. Bekteshi and other employees that he was going to "kick their ass" or "kick them in the head." *McPartland Decl., Exh. C, pp. 46–49, 141, 161–165.* On a more serious note, plaintiff also admitted—***after making several false denials at his deposition***—that he called the partner of his ex-girlfriend a "n***er" in a conversation he had with Mr. Bekteshi in the workplace. *McPartland Decl., Exh. C, pp. 180–190.*

By his own testimony, plaintiff admits he was not affected by any of this purported conduct by Mr. Harrison or Mr. Bekteshi. *McPartland Decl., Exh. C, p. 369.* He admitted that he suffered no emotional distress because of any such alleged conduct. *Id.* He also acknowledged that the alleged conduct had absolutely no impact on his job performance, as he repeatedly asserted that his work performance was excellent; that his department frequently met or exceeded its sales goals; and that he was among Mr. Harrison's "best managers." *McPartland Decl., Exh. C, pp. 46–50, 137, 146, 151, 162, 257, 259–263.*

## ARGUMENT

## I.

## PLAINTIFF'S EMPLOYMENT WAS LAWFULLY TERMINATED FOR VIOLATING THE "EMPLOYEE DISCOUNT" POLICY AND LYING

Plaintiff's wrongful termination claim fails because Equinox had a legitimate, non-discriminatory reason for terminating his employment, i.e. plaintiff's gross violation of company policy in providing more than $10,000 worth of discounted personal training sessions to his lawyer; his disregard of the David Harris Email; and his lie about purchasing the sessions prior to his receipt of the David Harris Email. Indeed, there is not a scintilla of evidence to suggest that

Equinox's termination of his employment was discriminatory in any way, much less that the real reason for the termination of his employment was because he is Iranian.

To establish a *prima facie* case of wrongful termination under Title VII, the plaintiff must demonstrate that "(i) he belonged to a protected class, (ii) he was qualified for the position he held, (iii) he suffered an adverse employment action, and (iv) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." *Sethi v. Narod*, 12 F.Supp.3d 505, 522 (E.D.N.Y. 2014).  If the plaintiff is able to establish a *prima facie* case, "the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its actions." *Joseph v. Owens & Minor Distribution, Inc.*, 5 F.Supp.3d 295, 308 (E.D.N.Y. 2014).  If the defendant satisfies this burden, the burden then shifts back to the plaintiff to demonstrate that the reason proffered by the defendant was false and that discrimination was the real reason.  *See e.g. Wojcik v. Brandiss*, 973 F.Supp.2d 195, 208 (E.D.N.Y. 2013) (an employer's articulated reason for an employment action "cannot be proved to be a pretext for *discrimination* unless it is shown *both* that the reason was false, *and* that discrimination was the real reason") (*emphasis in original*).  Thus, "the ultimate burden of [demonstrating] that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Whethers v. Nassau Health Care Corp.*, 956 F.Supp.2d 364, 375 (E.D.N.Y. 2013) (*internal quotations omitted*).

The Second Circuit courts have repeatedly granted summary judgment on wrongful termination claims under Title VII where, as here, the employer demonstrates that its reason for terminating the employee's employment was because of a violation of company policy or other similar conduct.  *See e.g. Kasiotakis v. Macy's Retail Holdings, Inc.*, 2015 WL 6125356, * 13 (S.D.N.Y. October 16, 2015) (granting summary judgment where employer proffered legitimate, nondiscriminatory reason for terminating employment of employee who distributed store

merchandise to an unauthorized recipient in violation of company policy and then lied about the incident); *Wojcik*, 973 F.Supp.2d at 208 (granting summary judgment where employer articulated legitimate, nondiscriminatory reason for terminating employee who deliberately issued "manual checks" to a client for a "food package change" in violation of company policy); *Stuart v. T-Mobile USA, Inc.*, 2015 WL 4760184, * 6 (S.D.N.Y. August 12, 2015) (granting summary judgment where employer's good faith belief that employee falsified her time records constituted a legitimate, nondiscriminatory reason for terminating her employment); *Anderson v. National Grid, PLC*, 93 F.Supp.3d 120, 141 (E.D.N.Y. March 25, 2015) (granting summary judgment where employer proffered legitimate, nondiscriminatory reason for terminating the employment of employee who, among other things, claimed overtime compensation to which he was not entitled); *Brown v. The Pension Boards*, 488 F.Supp.2d 395, 406 (S.D.N.Y. 2007) (employee's violation of company policy requiring him to contact his employer if he was going to be absent from work constituted legitimate, nondiscriminatory reason to terminate his employment); *Jackson v. Nor Loch Manor Healthcare Facility*, 297 F.Supp.2d 633, 636 (W.D.N.Y. 2004) ("an employer is entitled to discharge an employee who fails to follow company rules"), *aff'd* 2005 WL 1403266 (2d Cir. June 15, 2005).

Here, Equinox had a written policy which stated that the Employee Discount was to be used by employees only, and that employees using the discount for family, friends, or members would be subject to discipline up to and including termination of employment. *McPartland Decl., Exh. C, pp. 97, 322–323, Exh I, p. 33.* Plaintiff was provided with this policy and was aware of the policy. *McPartland Decl., Exh. C, pp 287–289.* This policy was reinforced to all Personal Training Managers, including plaintiff, just months prior to the termination of plaintiff's employment in the David Harris Email, which specifically stated that any employee who misused

the Employee Discount "will be subject to immediate termination." *McPartland Decl., Exh. C, pp. 323–324; Caporusso Aff., ¶ 4, Exh. B.*

Plaintiff expressly admitted in an email that he "purchase[d] the [personal training] sessions for [Ms. Cohen] as a gift" because she "did a favor for [him]" involving a custody dispute over his son, Naveed. *Caporusso Aff., ¶ 5, Exh. C.* He also lied in that email stating that he made the purchase prior to his receipt of the David Harris Email. *Id.*

Furthermore, Equinox conducted an investigation which revealed not only that the full scope of plaintiff's purchases for Ms. Cohen amounted to at least 276 personal training sessions totaling more than $10,000 in discounts, but also that at least 72 of those sessions were purchased *after* the David Harris Email. *Caporusso Aff., ¶¶ 6–7, Exh. D.* Based on these facts (which are undisputed by plaintiff), Mr. Caporusso concluded that plaintiff had grossly violated company policy and lied about his conduct and made the determination to terminate plaintiff's employment. *Caporusso Aff., ¶ 8; see also Kasiotakis v. Macy's Retail Holdings, Inc., supra.*

As there is absolutely no evidence that this legitimate non-discriminatory reason for the termination of plaintiff's employment was false and pretextual, plaintiff's wrongful termination claim must be dismissed in its entirety.

## II.

## PLAINTIFF WAS NOT SUBJECTED TO A HOSTILE WORK ENVIRONMENT

### A.   Plaintiff's Hostile Work Environment Claim Fails Under the Rigorous Standards of Title VII

To establish a hostile work environment claim, plaintiff "must come forward with sufficient evidence to show that the workplace was so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of [their] employment were thereby

altered." *Maxton v. Underwriter Laboratories, Inc.*, 4 F.Supp.3d 534, 545 (E.D.N.Y. 2014). "This test has objective and subjective elements: the misconduct shown must be severe or pervasive enough to create an objectively hostile or abusive work environment and the victim must also subjectively perceive that environment to be abusive." *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002) (*internal quotations omitted*).

Hostile work environment claims are subject to "demanding standards in order to avoid construing Title VII as a general civility code." *St. Louis v. New York City Health and Hosp. Corp.*, 682 F.Supp.2d 216, 232 (E.D.N.Y. 2010) (*internal quotations and alterations omitted*); *Monclova v. City of New York*, 2014 WL 4828813, * 9 (E.D.N.Y. September 29, 2014) ("simple teasing, off-hand comments, and isolated incidents" will not suffice) (*internal quotations omitted*); *Devers v. SNC-Lavalin Generation, Inc.*, 2014 WL 4954623, * 4 (E.D.N.Y. September 30, 2014) ("there must be more than a few isolated instances of racial enmity…there must be a steady barrage of opprobrious racial comments") (*internal quotations omitted*).

To determine whether a claim meets these demanding standards, the courts engage in a rigorous factual analysis to achieve a "***realistic view of the workplace***." *Sandyford v. Fort Greene Senior Citizen's Council, Inc.*, 2009 WL 705761, * 8 (E.D.N.Y. March 16, 2009) (*emphasis added*). Among other things, the courts consider the frequency and severity of the allegedly discriminatory conduct; whether the conduct was physically threatening or humiliating or unreasonably interfered with plaintiff's work; and what psychological harm plaintiff suffered, if any. *See Id.*, 2009 WL 705761 at * 8 (*citations omitted*).

Plaintiff's allegations in this lawsuit fall woefully short of these standards. As an initial matter, plaintiff's allegation that Mr. Harrison would sometimes "elongate" his name during weekly conference calls is not sufficiently severe to establish a claim under Title VII. *See e.g.*

13

*Benn v. City of New York*, 2011 WL 839495, * 10 (E.D.N.Y. March 4, 2011) ("laughing at and correcting plaintiff's accent, questioning plaintiff about his education, commenting vaguely about his age, and talking to him in an allegedly condescending manner" could not support hostile work environment claim).   In fact, there is no evidence to suggest that Mr. Harrison's playful pronunciation of plaintiff's name was even discriminatory, as the evidence demonstrates that Mr. Harrison joked around with numerous employees at work regardless of national origin. *McPartland Decl., Exh. D, pp. 42–45, Exh. G, pp. 50, 87, 100–101; see also Petrisch v. HSBC Bank USA, Inc.*, 2013 WL 1316712, * 15 (E.D.N.Y. March 28, 2013) ("only conduct prompted by plaintiff's membership in a protected class contributes to a hostile work environment claim").

Indeed, the lack of discriminatory animus on the part of Mr. Harrison is best represented by the fact that he was not only responsible for hiring plaintiff at Equinox, but he also repeatedly promoted plaintiff throughout his employment and encouraged plaintiff's work performance. *McPartland Decl., Exh. C, pp. 251–252, 259–268, Exh. D, pp. 43–44; see also Hyek v. Field Support Services, Inc.*, 702 F.Supp.2d 84, 101 (E.D.N.Y. 2010) (the fact that plaintiff's manager had previously created a supervisory position for plaintiff and then promoted her into this position "strongly suggest[ed] that invidious discrimination was unlikely").

As for plaintiff's allegations against Mr. Bekteshi—which consist of allegations that Mr. Bekteshi would make fun of his accent and jokingly refer to him as a "crazy Persian maniac" and a "fucking Persian"—these too fail to meet the severity requirements for a hostile work environment claim under Title VII.   To be sure, the Second Circuit courts have granted summary judgment dismissing numerous hostile work environment claims which were premised on far more serious comments and conduct.   *See e.g. Heba v. New York State Div. of Parole*, 537 F.Supp.2d 457, 467 (E.D.N.Y. 2007) (supervisor's "insulting and offensive" references to plaintiff as a

"camel jockey" and a "fucking Arab" and telling a police officer that he "smelled a camel behind [plaintiff]" were not sufficient to support a hostile work environment claim); *Devers*, 2014 WL 4954623, * 4–5 (E.D.N.Y. September 30, 2014) (supervisor's references to African American plaintiff as a "big black buck" and his expressed desire to hire "good ole boys from the South" to replace poor performing employees and supervisor's placement of Confederate flag stickers on his sign-in sheets and hardhat were not sufficient to support a hostile work environment claim); *Dorrilus v. St. Rose's Home*, 234 F.Supp.2d 326, 335 (S.D.N.Y. 2002) (referring to plaintiff as "El Negro" on several occasions deemed insufficiently severe for hostile work environment claim); *Monterroso v. Sullivan & Cromwell, LLP*, 591 F.Supp.2d 567, 584 (S.D.N.Y. 2008) (lawyer's references to secretary "as a 'stupid Italian' on several occasions" could not support a hostile work environment claim); *Gobin v. New York City Health and Hospitals Corp.*, 2006 WL 2038621, * 5 (S.D.N.Y. July 19, 2006) (statements to plaintiff that "Hinduism is not even a real religion," "you are a devil worshiper because you are a Hindu," "West Indians are low class people," that they "preferred working with African Americans" and "[their place of employment] belongs to black people" could not support a claim for hostile work environment); *Stembridge v. City of New York*, 88 F.Supp.2d 276, 286 (S.D.N.Y. 2000) (workplace references to black youths as "animals," to Mayor Dinkins as a "washroom attendant," to plaintiff as an "uppity nigger" and "boy," and a black doll being hung on a doorframe near plaintiff's workstation did not constitute a hostile work environment); *Wesley-Dickson v. Warwick Valley Cent. School Dist.*, 973 F.Supp.2d 386, 406 (S.D.N.Y. 2013) (statements that plaintiff sounded "just like Aunt Jemima" and like she was "down on the plantation" and that the African American leaders of a diversity conference were "a waste of time" and "had no validity" could not form the basis of a hostile work environment claim).

In any event, any such alleged comments by Mr. Bekteshi cannot be separated from plaintiff's own conduct and attitude in the workplace. Plaintiff admitted that he frequently joked around with Mr. Bekteshi and other employees, which, according to plaintiff, included him routinely telling Mr. Bekteshi and other employees that he was going to "kick their ass" and "kick them in the head." *McPartland Decl., Exh. C, pp. 46–49, 141, 161–165.* As plaintiff also admitted (after repeated false denials), he even used a racially opprobrious term in a workplace conversation with Mr. Bekteshi calling his ex-girlfriend's new partner as a "n***er." *McPartland Decl., Exh. C, pp. 180–190; see also Heba*, 537 F.Supp.2d at 468 (dismissing hostile work environment claim after analyzing manager's "insulting and offensive" race-based comments toward plaintiff in "the context of their relationship").

Finally, and perhaps most tellingly, plaintiff's own testimony establishes that he was not affected by any such alleged conduct on the part of Mr. Harrison or Mr. Bekteshi. He unequivocally admitted that the alleged conduct did not cause him any emotional distress. *McPartland Decl., Exh. C, p. 369; see also Sandyford*, 2009 WL 705761 at * 10 (plaintiff's lack of psychological harm is "relevant to whether [she] actually found the environment abusive"); *Richards v. NYC Dept. of Homeless Services*, 2009 WL 700695, * 7 (E.D.N.Y. March 15, 2009) (dismissing hostile work environment claim reasoning, among other things, that "there is no evidence that plaintiff sought psychiatric treatment or that he suffered psychological harm"). Further, his testimony establishes that any such alleged conduct had no impact on his performance, as he repeatedly testified that he was a "high performance" employee; that his department frequently met or exceeded its sales goals; and that he was among Mr. Harrison's "best managers." *McPartland Decl., Exh. C, pp. 46–50, 137, 146, 151, 162, 257, 259–263; see also Sandyford*, 2009 WL 705761 at * 10 (dismissing hostile work environment claim reasoning, among other things,

that "there is no evidence that the conduct interfered with plaintiff's ability to work or that it was of such a level that she felt compelled to resign").

Taking consideration of these factors, plaintiff's hostile work environment claim must be dismissed. *See Heba*, 537 F.Supp.2d at 468.

**B.      Plaintiff's Hostile Work Environment
        Claim is Barred by the *Faragher-Ellerth* Defense**

Even assuming plaintiff's allegations regarding Mr. Harrison and Mr. Bekteshi are sufficient to maintain a hostile work environment claim (which they are not), his claim is barred under the *Faragher–Ellerth* defense because he never made a protected complaint of discrimination prior to the termination of his employment.  Under *Faragher–Ellerth*, an employer cannot be held liable under a hostile work environment claim where (i) it has exercised reasonable care to prevent and correct promptly any harassing behavior, and (ii) the employee fails to take advantage of any preventive or corrective opportunities provided by the employer.  *See e.g. McPherson v. NYP Holdings, Inc.*, 2005 WL 2129172, * 8 (E.D.N.Y. September 1, 2005), *aff'd* 2007 WL 1830764 (2d Cir. June 27, 2007).

Here, Equinox had written anti-discrimination policies and complaint procedures in place during plaintiff's employment.  Plaintiff was fully aware of these policies and procedures both as an employee and a manager of a staff of more than 40 employees, including the options for him to complaint to Human Resources or via the Ethics Hotline.  *McPartland Decl., Exh. C, pp. 93–95, Exh. H, Exh. I; see also Ferraro v. Kellwood Co*, 440 F.3d 96, 102 (2d Cir. 2006) ("[a]n employer may demonstrate the exercise of reasonable care, required by the first element, by showing the existence of an antiharassment policy during the period of the plaintiff's employment").

Nevertheless, plaintiff never made a protected complaint of discrimination during his employment.  It was not until ***after*** his employment was terminated (at which time he complained

only of Mr. Harrison and said nothing regarding Mr. Bekteshi) that he complained about any purported discriminatory conduct. *McPartland Decl., Exh. C, p. 214.* As such, his hostile work environment claim must be dismissed. *See e.g. McPherson*, 2005 WL 2129172 (dismissing Title VII claims where employee failed use the complaint procedure provided by employer).

<u>**CONCLUSION**</u>

Based on the foregoing, defendant Equinox Great Neck, Inc. respectfully requests that the Court (i) dismiss plaintiff's Complaint in its entirety with prejudice, pursuant to Rule 56 of the Federal Rules of Civil Procedure, and (ii) grant defendant all such other relief as this Court may deem just and proper.

Dated: New York, New York
      July 13, 2018

                            LAROCCA HORNIK ROSEN
                            GREENBERG & BLAHA LLP

            By: _____
                            Lawrence S. Rosen (LR-8027)
                            Patrick McPartland (PM-4225)
                            Jared E. Blumetti (JB-1214)

                            40 Wall Street, 32nd Floor
                            New York, New York 10005
                            T: (212) 530-4837
                            E: LROSEN@LHRGB.COM
                                PMCPARTLAND@LHRGB.COM
                                JBLUMETTI@LHRGB.COM

                            *Attorneys for defendant*
                            *Equinox Great Neck, Inc.*

18